**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **BENJAMIN MOSLEY; STEVEN TUCKER; GRAYSON YOUNG; and KURT STRANGE, individually and on behalf of those similarly situated.** | * **CIVIL ACTION NO. 2:23-cv-02674**<br>*<br>* **HON. JAY C. ZAINEY**<br>*<br>* **MAG. KAREN WELLS ROBY** |
| *Plaintiffs*, | * |
| vs. | * **COLLECTIVE ACTION**<br>* **29 U.S.C. § 216(b)** |
| **BRISTOW U.S., LLC and BRISTOW GROUP, INC.** | *<br>*<br>* **JURY TRIAL DEMANDED** |
| *Defendants*. | * |
| * * * * * * * * * * * * * * * * * * * | * |

## PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Benjamin Mosley, Steven Tucker, and Grayson Young, along with all opt-in Plaintiffs, (collectively "Plaintiffs"), hereby oppose Defendants' second Motion for Summary Judgment.  It is undisputed that Bristow does not pay the Plaintiffs overtime premiums for working over forty hours in a week, and only pays for 11.43 hours of each 12-hour shift – both facially illegal under the Fair Labor Standards Act ("FLSA").  The disputed issue is whether Bristow may claim an FLSA exemption.

Defendants seek to apply the Railway Labor Act ("RLA") common carrier exemption to a unique exclusive consortium business model of their own devising.  This consortium is composed of a limited group of entities operating in the Gulf of Mexico who undertake extensive, private, high-end negotiations with Defendants to sub-contract those select consortium members' SAR/Medevac needs regarding offshore operations and employee transport. The consortium is a complex system of tiered long-term memberships where those select members and Bristow agree to the ready utilization of Bristow's services to the exclusion of others.

To qualify as a common carrier under the RLA, a company must offer its services "indiscriminately to any member of that [market] segment willing to pay for those services." Yet Bristow's own witnesses admit that any member of the public, or any Gulf of Mexico oil company, that called Bristow requesting a SAR or medevac flight would be turned down as ineligible for transportation. A company looking to contract out this service would be instead be vetted for consideration of joining the consortium and, if feasible, to begin negotiations for a contract. Simply joining the consortium takes at least 30 days, and sometimes over six months.[1]

The consortium Memorandum of Understanding ("MOU"), combined with individual client contracts, are carefully crafted to provide the maximum amount of control regarding the relationship between Bristow and the consortium members. Those agreements define every aspect of the contractor relationship, and Bristow absolutely refuses to provide SAR air transport to any person or entity who has not formally opted into the consortium. Bristow responds that this tightly defined and narrowed customer base, with predictable rights and expectations, is more efficient and more profitable.[2] That may be, but it is not reflective of a genuine common carrier status. A reasonable juror may find that Bristow has failed to meet its burden of proof that it indiscriminately offers its air transport services within the Gulf of Mexico SAR market segment and is therefore not an exempt common carrier under the RLA.

## LEGAL STANDARD

On summary judgment, the moving party bears the burden, and all reasonable factual inferences must be drawn in the non-moving party's favor.[3] "Credibility determinations, the

---

[1]    Deposition of Kade Monlezun ("Monlezun Depo.") at 41.

[2]    Monlezun Depo. at 26-27.

[3]    *Camowraps, LLC v. Quantum Digital Ventures LLC*, 74 F. Supp. 3d 730, 738 (E.D. La. 2015).

weighing of the evidence, and the drawing of legitimate inferences from the facts" remain "jury functions, not those of a judge."[4]  "Rule 56 forbids this Court from considering the ultimate weight of the evidence so long as some supporting the movant and nonmovant can be discerned."[5]  The RLA exemption is an affirmative defense upon which the employer bears the burden of proof.[6]  Summary judgment on an affirmative defense is a very high burden: "the movant must establish beyond peradventure *all* of the essential elements of the … defense."[7]

## FACTS[8]

### A.    The Parties

Bristow is a helicopter company headquartered in Houston, Texas.  Bristow operates two separate divisions within the Gulf of Mexico – the "oil and gas" division, and the SAR (i.e., search and rescue) / Medevac division.[9]  "Oil and gas" flights constitute regularly scheduled transportation of workers to and from rigs and platforms in the Gulf – for example, for a shift change.  Those helicopters carry no medical or rescue equipment, and require no special air crew beyond the pilots.[10]  As Area Manager Jason Glynn testified, there is a "true division" between the two sections (although this was not always the case, years ago), and oil and gas aircraft cannot fly SAR or Medevac flights.[11]

---

[4]    *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1129 (5th Cir. 2014).

[5]    *Ariza v. Loomis Armored US, LLC*, 132 F. Supp. 3d 775, 794 (M.D. La. 2015).

[6]    *See White v. United States Corr., L.L.C.,* 996 F.3d 302, 310 (5th Cir. 2021) and cases cited therein.

[7]    *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017).

[8]    On summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[9]    Deposition of J. Glynn ("Glynn Depo.") at 112-113.

[10]    Glynn Depo. at 20 (discussing different equipment loads) and 40 (discussing different crews).

[11]    Glynn Depo. at 19.

The Plaintiffs in this action all work in the SAR/Medevac division. Helicopters within this division are outfitted with specific equipment to conduct water rescues, including rescue hoists which could be used to draw individuals out of the water, or off of a rig that did not have the capacity for landing the helicopter.[12] Plaintiff Glenn Jimenez is an SAR pilot; the other plaintiffs are all rescue swimmers or hoist operators, sometimes called the "tech crew."[13] Flight medics are also present on SAR/Medevac flights, although they are hired through a third-party contractor.[14] Because of the specialized nature of SAR/Medevac operations, the pilots and crew are held to more stringent training requirements due to the more exacting mission requirements.[15] SAR requires specialized skills which are usually (although not always) developed in the military; in fact, each of the Plaintiffs in this case is a veteran of the US or UK military.[16]

The most common calls for SAR/Medevac services involve respiratory or cardiac distress.[17] Bristow categorizes calls from Status 1 (urgent search and rescue / critical medical emergency) to Status 4 (non-emergency medical trauma).[18] There is also a rare "Status 5" for non-emergency, non-medical flights – generally this includes a time sensitive request for parts delivery, although even parts runs could be critical, as a rig may be in jeopardy.[19] Flights are

---

[12]   *See* Mem. Of Understanding, ("MOU") § 3.4.3 (chart detailing specific equipment maintained on each model of SAR/ Medevac aircraft). *See also* Deposition of B. Mosley ("Mosley Depo.") at 118-120.

[13]   Dkt. #1, Complaint, ¶ 12. Former Plaintiff Kurt Strange was a pilot; he voluntarily withdrew his claim in early 2025. *See* Dkt. #85.

[14]   Glynn Depo. at 51.

[15]   Bristow Rule 30(b)(6) Depo. at 27-29.

[16]   Glenn Jimenez, Ben Mosley, and Michael Fout are Navy veterans. Jimenez Depo. at 12; Mosley Depo. at 87; Fout Depo at 11. Nick Arzamendi was a flight paramedic in the Army. Arzamendi Depo. at 12. Ryan Tucker is a Coast Guard veteran. Tucker Depo. at 38-40. Ryan Thomas is a veteran of the United Kingdom military, as air crew and flight paramedic. Thomas Depo. at 17-18

[17]   Mosley Depo. at 51-52.

[18]   MOU, § 5.

[19]   Thomas Depo. at 68-69, 75– "Worst-case scenario, obviously, is a rig, you know, with the top being blown off with everybody in the water in their vessels."

"divertible" based on status; if an aircraft is en route to a patient with a sprained ankle, and another consortium member calls with a heart attack, the craft will divert to a more urgent call.[20]

## B. Bristow's Exclusive Consortium Model

Although Bristow's motion for summary judgment acknowledges the existence of the SAR consortium, it is tellingly light on details as to that consortium's rules and operations. But this exclusive consortium model is key to understanding this case and why Bristow's RLA common carrier exemption must fail. As the moving brief acknowledges, Bristow <u>categorically refuses</u> to provide Gulf of Mexico SAR or Medevac services to any person or entity who is not a member of this consortium. As Glynn has stated in a sworn declaration, "customers are **required** to join a consortium membership before they can receive [SAR or medevac] services."[21] (emph. added). Deposition testimony confirms this fact.

Although Bristow's memorandum calls itself an "air ambulance" company, that is not a completely accurate description. Bristow does not operate a 911-style service, where anyone in the Gulf with a medical emergency (and the ability to pay) may call a number and request a pick-up. Bristow refuses to consider these "ad hoc," flights for SAR or medevac services.[22]

As Glynn testified, Bristow's services are unavailable to individuals and companies outside of oil and gas industries: "Well, let me back that up. When you say 'general public' we give our number to the offshore community, not people on the side of the road or in residential subdivisions."[23] When asked whether Bristow would provide SAR/medevac services to "somebody lost in the Gulf" or with an "emergency on their boat," the answer was

---

[20] MOU, § 5.

[21] Dkt. #17-2, Aug. 28, 2023 Declaration of Jason Glynn, ¶ 4. To the extent that Glynn now seeks to backtrack or contradict his prior declaration, that would constitute a dispute of fact requiring denial of summary judgment.

[22] Glynn Depo. at 62-64.

[23] Glynn Depo. at 77

straightforward:  "No."[24]  In fact, Bristow has *never* taken an ad hoc flight for a member of the general public outside the oil and gas industry.[25]  Even within the "offshore community" [i.e., oil and gas exploration and production companies], Bristow only offers SAR/Medevac flights to members of its consortium.

It is undisputed that Bristow does not offer *ad hoc* SAR/Medevac flights for customers (or potential customers) outside the consortium.  Bristow has enforced this policy strictly since, at least, January 2023.[26]  A review of Bristow's 2023-2024 flight logs reflect *zero* SAR or Medevac flights to any customer or potential customer outside the consortium.  Glynn admits as much: "customers are required to join a consortium membership before they can receive such services."[27]  Individual plaintiffs testified as to their frustration at their inability to go on calls to do their job in provide needed assistance regarding someone who was not in the consortium.[28]

Bristow contends that limiting its clientele to an exclusive consortium had a "positive impact" on its business – in other words, it makes more money.[29]  This is no surprise; the ability to pick and choose one's customers discriminately is no doubt beneficial to the bottom line.  But it is emphatically not a hallmark of the common carrier, as "the distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently"[30] and is "willing to transport for hire, indiscriminately."[31]  Bristow does differentiate and discriminate between different potential customers – even oil companies in the Gulf of Mexico - and refuses service to

---

[24]  Glynn Depo. at 77-78.

[25]  *Id.*

[26]  *Id.*, ¶ 7.

[27]  Dkt. #17-2, Glynn Decl., ¶ 4.

[28]  Jimenez Depo. at 105; Fout Depo. at 79, 103-104; Tucker Depo. at 72.

[29]  Monlezun Depo. at 55-56.

[30]  *Semon v. Royal Indem. Co*., 279 F.2d 737, 739 (5th Cir. 1960) (citing 9 Am. Jur, Carriers, § 4).

[31]  *Thibodeaux v. Exec. Jet Int'l, Inc.*, 328 F.3d 742, 750 (5th Cir. 2003).

those who do not belong in the exclusive consortium.  Plaintiffs do *not* allege that Bristow's exclusive consortium model is inherently illegal or unethical.  Every company is in business to make money, and Bristow has the right to organize its business in such a way as to maximize its profits.  But operating under that model takes Bristow outside the scope of the RLA common carrier overtime exemption.  The illegal behavior is not the consortium model *per se*, but Bristow's refusal to pay overtime premiums to Plaintiffs and other SAR employees.

The consortium is made up of sixteen companies plus one federal government agency.[32] Membership is divided into tiers, which roughly correspond to different service levels.  Tier 1 members have access to Bristow's larger, longer-ranged aircraft needed to carry out those oil companies' business.[33]  Higher tier members tend to have more facilities offshore, and therefore use Bristow's services more regularly.[34]  Tier 1 members also have particular voting rights as well as the right to attend the consortium's twice-yearly meetings.[35]  At those meetings, Tier 1 members discuss and agree upon proposed changes to the MOU, which are then promulgated to (and binding on) lower-tier members of the consortium.[36]  Individual Tier 1 members can also negotiate additional reports, or additional contractual provisions, that are inapplicable to others.[37]

Refusing service to other companies outside this exclusive consortium is hardly "indiscriminate." For example, the consortium only includes subcontracted services to 12 of the

---

[32]    Glynn Declaration, Dkt. #17-2, ¶ 10.  That statement was made in late 2023.  Bristow currently claims fifteen consortium members, *see* Dkt. #92-2 at p. 13, an even more exclusive club.

[33]    Glynn Depo. at 74-75.

[34]    *Id.* at 75.

[35]    Glynn Depo. at 81-82, MOU, § 6.2.  The tier 1 members are also the only formal signatories to the MOU, see *id.* at § 0.3 (listing the four Tier 1 members and Bristow as signatories).

[36]    Glynn Depo. at 83.

[37]    Bristow 30(b)(6) Depo. at 76-78.

top 50 oil companies[38] operating in the Gulf of Mexico in the year 2022 - that is 24%.  Over three-quarters of the top 50 oil companies operating in the Gulf would be refused SAR/Medevac or other services as non-members of the consortium model implemented by Bristow and its top members.  Again, Plaintiffs take no issue with the fact that Defendants and their consortium have identified a select particular class of members within the Gulf oil producer segment in order to boost profits,  but such a private consortium model that rejects others is incompatible with the common carrier's "indiscriminate" mandate.  The members likewise benefit from knowing that they have some degree of exclusivity when their employees need medical assistance – and Bristow can no doubt charge an additional premium for that degree of exclusivity. Put another way, it makes sense that Defendants reserve their scarce resources to maximize availability, but that also means it excludes (and admittedly rejects) those other oil producers in that segment, eroding the right to the claimed exemption.

This exclusive consortium model does not apply to the oil and gas side of the business.[39] The oil and gas division, which operates different aircraft, on different schedules, with different crews, does consider ad hoc flight requests, and consortium membership is not required.[40]  As Glynn testified, there is a "true division" between SAR and oil and gas at Bristow.[41]

C.    **The Memorandum of Understanding**

The Memorandum of Understanding ("MOU") is a key document defining the rights and obligations that come with being a member of Bristow's exclusive SAR consortium.  Each

---

[38]    Bureau of Ocean Energy Mgmt., *Top 50 Company Report 1954–2023*, U.S. Dep't of the Interior (2023), https://www.boem.gov/sites/default/files/documents/LeaseStudy-Top50.pdf,  last  visited  03.27.25.  The consortium members in this list include Eni, Total, Beacon, Exxon, Kosmos, Hess, Equinor, Shell, Murphy, BP, QuarterNorth, LLOG, and Talos.

[39]    Glynn Depo. at 83:  "Q. Is there a separate MOU, parallel MOU, on the oil and gas transportation side?  A. No."

[40]    Glynn Depo. at 63.

[41]    Glynn Depo. at 19.

contract between Bristow and an individual consortium member incorporates this MOU by reference.[42]  As Glynn testified:  "Every customer abides by the MOU is how we say we're going to operate the program."[43]  However, only Tier 1 operators – generally, the largest multinational oil companies – participate in actually drafting or editing the MOU.[44]  For example, in the MOU dated 16 March 2023, the only signatories are Occidental, Shell, Hess, BP, and Bristow.[45]  All consortium members, even smaller Tier 2 or Tier 3 members, must abide by its terms.

In the MOU, Bristow specifically defines its "Customers" as the members of the Consortium.[46]  The MOU is detailed and, as Glynn put it, "robust."[47]  It defines the chain of command;[48] the types of aircraft as well as the schedules, capacities, and equipment loadouts of each model;[49] the schedule of the SAR crewmen (i.e., plaintiffs);[50] the precise qualifications, written recommendations, and training schedules required for each crewman;[51] the dispatch and triage procedures;[52] the status reports sent to each consortium member (delineated by tier);[53] and a detailed list of expectations regarding KPIs (Key Performance Indicators) for Flight Incident Rates, Reportable Incident Rates, Aircraft Availability, Staffing Currency, Crew Retention, On-

---

[42]    Glynn Depo. at 98.

[43]    *Id.*

[44]    *Id.*

[45]    MOU, § 0.3 "Signatures."

[46]    MOU, § 1 "Preface."  ("References herein to Bristow US LLC or Era Helicopters LLC, (each, as applicable, the 'Operator') and the consortium members (each a 'Customer' and collectively, the 'Consortium.")

[47]    Glynn Depo. at 147.

[48]    MOU, § 3.2 and § 3.2.1.

[49]    *Id.*, § 3.4 - § 3.5.

[50]    *Id.*, § 3.3.

[51]    *Id.*, § 3.9.

[52]    *Id.*, § 4.1 - § 4.3.

[53]    *Id.*, § 4.5.

Time Departure, and Mission Completion.[54]  Bristow is then required to measure and submit each of these KPIs to all consortium members via a monthly report.[55]

Suffice to say, the MOU sets forth a detailed explanation of the rights and obligations of Bristow and each of the members of the consortium which it services.  However, merely agreeing to the MOU is not sufficient to join the consortium, as potential or would-be consortium members must also enter into individual agreements, as discussed below.

### D.    Individual Consortium Contracts

Although the MOU sets forth many details applicable to the operation of the SAR consortium, it does not cover all contingencies.  Pricing, for example, is not included in the MOU.  Unlike most genuine common carriers who offer their services indiscriminately, Bristow does not publish a set rate sheet or price list for its services.  In fact, Bristow does not reveal its pricing structure to any persons or entities who are "not currently within the [consortium] membership."[56]  (All such information has been entered as Attorney Eyes Only under the Protective Order).

Bristow also requires consortium members to enter into individual contracts before it will provide any air transport services.  Once a potential customer makes initial contact with Bristow, if allowed into the consortium, it would take anywhere from "30 days" to "as much as six plus months" to actually negotiate a contract.[57]  In the meantime, Bristow will not provide SAR/Medevac services to that company unless and until the contract is final:  "we'll wait for

---

[54]  *Id.*, § 6.1 - § 6.1.8.

[55]  *Id.*, § 6.1.  This report goes out to all consortium members.  Other reports are sent only to Tier 1.  *See* id., § 4.5.

[56]  *See* Glynn Depo. at 78. *Thibodeaux v. Exec. Jet Int'l, Inc.*, 328 F.3d 742, 753 (5th Cir. 2003) (stating that "most common carriers do utilize uniform tariffs applicable to all who apply for service" while noting that the existence, or lack, of a uniform price sheet is not "conclusive proof" of this issue).  While the lack of a set price list may not be "conclusive proof," it is nevertheless a factor weighing against common carrier status.

[57]  Monlezun Depo. at 41.

contracts are in to provide services, or some form a signed agreement with terms and conditions and pricing."[58]    A member of the consortium thus must agree to both the MOU and an individually negotiated long-term commercial contract in order to utilize Bristow's services as a carrier by air.

Individual consortium contracts vary greatly in length and complexity, and some are dozens of pages long.  An "Attorney's Eye Only" designation precludes Plaintiffs from going into great detail in this filing, although certain documents will be filed under seal for *in camera* review.  At a high level of generality, and without disclosing specific information regarding any particular customer, the types of topics addressed in these contracts include:

- Pricing
- Crew Complements
- Technical specifications for the aircraft
- Maintenance requirements
- Rights to inspect or review the aircraft or facility, or audit certain records
- Indemnification and/or insurance requirements
- Regulatory compliance obligations
- Penalties if there is no aircraft available if requested by a consortium member[59]

As Exxon's counsel explained, these contracts are "uniquely negotiated provisions that reflect commercial negotiations" including "confidential commercially sensitive information, vulnerable safety and security information, and private information."[60] Another Tier 1 signatory consortium member, Hess, wrote to this Court that "the Hess Agreements are highly sensitive and Hess intends, and its contracts require, that Bristow keep information relating to the services to be provided or performed by Bristow in the strictest of confidence."[61] These statements are

---

[58]    Monlezun Depo. at 41-42.

[59]    See attached agreements, which were sealed and marked confidential by Bristow and the consortium members.

[60]    Exxon Letter to Mag. Judge Dossier, Dkt. #81, p. 1.

[61]    Dkt. #79.

hardly reflective of a common carrier relationship involving a company who openly and indiscriminately offers its services to any market actor willing to pay.

In denying Defendants' first "Motion to Dismiss AND/OR Motion for Summary Judgment,"[62] this Court identified the problem "with the extraneous evidence" Defendants interjected in an attempt to frame their business as a common carrier without having to actually provide discovery. Now that the evidence has been provided, albeit not without many discovery disputes in obtaining that evidence, the reality is quite different from what Bristow argued before.

## ARGUMENT

### A.    Legal Standard for The RLA Common Carrier Exemption

The Fair Labor Standards Act generally requires employers to pay employees a time and a half overtime premium for hours worked over forty in a workweek. 29 U.S.C. § 207(a). There are, however, a number of exemptions. Section 13(b)(3) of the FLSA, 29 U.S.C. § 213(b)(3), exempts "any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act" from overtime pay. The Railway Labor Act, in turn, refers to a "common carrier by air engaged in interstate or foreign commerce…" 29 U.S.C. § 181.[63]   The question is therefore whether Bristow has proven, under the "beyond peradventure" standard set forth in *Fontenot v. Upjohn Co.,* 780 F.2d 1190 (5th Cir. 1986), that undisputed facts confirm that it is a common carrier by air. The Fifth Circuit has held that "the crucial determination in assessing the status of a [common] carrier is whether the carrier has held itself out to the public or to a definable segment of the public as being willing to transport for hire, indiscriminately." *Woolsey v. Nat'l*

---

[62]    Dkt. #17.

[63]    The original RLA predates the airline industry, but expanded to cover common carriers by air in 1936.

Page 12

*Transp. Safety Bd.*, 993 F.2d 516 (5th Cir. 1993).  Whether Bristow meets that definition is the principal issue before the Court.

### B.    Defendants' Citations to NMB Decisions are Unavailing

Bristow makes much of supposed "previous recognition" of its common carrier status, citing a decision of the National Mediation Board ("NMB") which, in turn, cites to another decision of the NMB.  Those decisions, issued by an Article I agency rather than an Article III court, in a non-FLSA context, are non-binding and non-precedential for several reasons.

Most obviously, the NMB decisions are not binding on the common carrier question because both the union and Bristow *stipulated* that Bristow/Era[64] was a common carrier: "No participant contests Era's status as a carrier under the Act."[65]  Indeed, the analysis on this point is relegated to a footnote.  It is well settled that "a decision merely accepting the parties' agreement, is not binding" as precedent.[66]  As the  Fifth Circuit has held, "[w]here an opinion fails to address a question squarely, we will not treat it as binding precedent."[67]  And for purposes of collateral estoppel or issue preclusion, one necessary element is that "the issue must have been actually litigated in the prior action" and "contested by the parties" thereto.[68]  That is not the case here.

In short, the NMB decisions bear little if any precedential weight according to binding Fifth Circuit caselaw.  The fact that, in 2020, the Union and the company agreed – for their own purposes and their own reasons – that Bristow/Era was a common carrier (as is required for the

---

[64]   This NMB decision issued while the companies were in the process of merging.  The merger was completed prior to the three-year time period at issue in this action, and the combined "Bristow" entities are the relevant defendants for the purposes of this case.

[65]   In the Matter of the Application of Office and Prof. Employees Int'l Union, 48 NMB 37, fn. 1 (2020).

[66]   *Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1373 (Fed. Cir. 2003)

[67]   *Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 370 n.11 (5th Cir. 2002).

[68]   *In re Clem v. Tomlinson*, No. 22-11072, __ F.4th __ (5th Cir. Dec. 23, 2024) (collecting cases).

union to seek NMB representation) cannot be binding on these plaintiffs, who were not parties to that decision.

This 2020 NMB decision likewise cites to 2011 and 2013 NMB decisions finding Bristow to be a common carrier for purposes of certifying a union election; those one-page decisions are more akin to minute entries than reasoned opinions and provide no justification or basis for the common carrier finding – it is simply stated as a conclusion that (at least in 2011 or 2013) Bristow was a common carrier.  Again, this contention was not challenged by either Bristow or the union; therefore, as it was not litigated or contested, those decisions cannot qualify as precedent.

The NMB decisions are likewise irrelevant because they predate the issues raised in this lawsuit.  It is undisputed that, as of January 1, 2023, the Bristow SAR division  fundamentally changed the way in which it addressed the consortium and ad hoc flights. After January 1, 2023, the consortium was mandatory and required for any air services from Bristow SAR, and ad hoc flights were simply forbidden.  This was not the case in 2011, 2013, or 2020.  Thus, to the extent that the NMB was addressing the factual circumstances *as they existed at the time*, those comments would be wholly irrelevant to Bristow's business model post-dating January 1, 2023.

### C.    Defendants' Citations to CBAs are Unavailing

Defendants also rely heavily on two collective bargaining agreements (CBAs) which, it claims, support its RLA exemption.  Those CBAs, which have long since expired and are no longer in effect, are both legally and factually irrelevant.

The Supreme Court has long held that "FLSA rights cannot be abridged by contract" and "congressionally granted FLSA rights take precedence over conflicting provisions in a

Page 14

collectively bargained compensation arrangement."[69]  That has been settled law for eighty years: "[CBAs] cannot supersede the Act and are not a bar to this action."[70]  Employees are protected from a union negotiating away their statutory overtime rights, so the CBAs are legally irrelevant.

From a factual perspective, the CBAs are inapposite to the plaintiffs and time period currently before the Court.  The operative CBAs date from pre-merger Bristow and, importantly, were drafted in 2012 and 2014.[71]  That long precedes the three-year time frame at issue in this case, and long precedes Bristow's transition to its exclusive consortium model.  They also predate Bristow's merger with Era Helicopters.  The factual circumstances of Bristow's business operations have changed drastically in the following years, and CBAs drafted over a decade ago tell us nothing about whether Bristow is *currently* operating as a private or common carrier. Moreover, the vast majority of the Plaintiffs to this action were not in a union.[72]  It would be absurd to let union-negotiated CBAs bind individuals who were not members of those union, had different job titles, worked at a different time period, and based on an inapplicable fact scenario.

Bristow relies heavily on these previous "common carrier" statements from the NMB and the former unions.  Unfortunately for Bristow, none of those statements is legally relevant to this case.  The actual facts of Bristow's exclusive consortium model are legally relevant, and those facts fall far short of establishing the RLA common carrier exemption.

### D.    More Relevant Non-Binding Authority Arises From This Court

---

[69]    *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740-41 (1981).

[70]    *Martino v. Mich. Window Cleaning Co.*, 327 U.S. 173, 178 (1946) (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945)

[71]    *See* Dkt. #92-14 (dated March 2012-March 2015); Dkt. #92-16 (dated June 2014 – April 2017).

[72]    Glynn Depo. at 35, noting that "mechanics and pilots" were unionized.  Glenn Jimenez is the only Plaintiff in either of those positions; the rest are not union members and never have been.

More recent than Defendants' irrelevant CBAs is a case arising from this District where another helicopter company, Priority 1 Air Rescue, was sued under the FLSA and paid overtime to its employees as a result. The *Priority 1* case, like this one, involved "paramedics, hoist operators, and other personnel" who "staff air ambulance missions" out of Terrebonne Parish and were not paid overtime premiums.[73]

In *Priority 1,* Judge Milazzo held both an initial fairness hearing and a final fairness hearing on the proposed settlement, and ultimately approved the parties' agreement.[74] Specifically, the *Priority 1* defendant raised the RLA exemption,[75] so it stands to reason Judge Milazzo must have found a "bona fide dispute" existed regarding the FLSA claims at issue in that case, as that is a prerequisite before confirming any FLSA settlement.[76] The *Priority 1* matter was settled at an early stage, before any ruling was made on any exemption, so Plaintiffs do not contend that it created substantive binding precedent. At the same time, it is both more recent and more relevant than the irrelevant CBAs and NMB decisions relied upon by Bristow.[77]

### E.    Bristow Fails to Establish That it is Indisputably a Common Carrier

Under binding Fifth Circuit caselaw, Bristow bears the burden of showing "beyond peradventure"[78] that it is "willing to transport for hire, indiscriminately,"[79] to anyone within its markety who is willing to pay.  This it cannot do.

---

[73]    *Landry v. Priority 1 Air Rescue Ops, LP*, 15-cv-06979-JTM-SS (E.D. La.) at Dkt. #1, at ¶¶ 8-12.

[74]    *Id.* at Dkt. #19, Dkt. #24.

[75]    *Id.*, Dkt. #18 p. 10.

[76]    *See Catherine v. SureTemps, LLC,* 2019 U.S. Dist. LEXIS 145385, (E.D. La. Aug. 27, 2019) ("the Court considers whether there is a genuine dispute as to the Defendant's liability under the FLSA, as without a *bona fide* dispute, no settlement could be fair and reasonable.") (internal citations omitted).

[77]    The law firm who represented Priority One is the same firm currently representing Defendants here.

[78]    *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017).

[79]    *Thibodeaux*, supra, 328 F.3d at 750.

Page 16

In fact, it is undisputed that Bristow is <u>not</u> willing to transport a medical patient within the Gulf of Mexico for any person or entity who is not already a member of its exclusive consortium.    That should end the analysis – this is not "indiscriminate" and it is not how a common carrier works.  Bristow attempts a sleight of hand.  It admits that, due to the consortium model, it does not actually offer "transport for hire" indiscriminately, but it nevertheless claims that it is indiscriminately willing to *enter into negotiations* with any potential customer regarding *possibly* joining the consortium, effective within 30 days to six months (assuming the parties can agree on terms).  But what the RLA contemplates, and what the Fifth Circuit's *Thibodeaux* decision expressly states, is that the *transport for hire* must be offered indiscriminately.   That is simply not the case for Bristow SAR.  The very nature of SAR/Medevac services drive home the importance of this distinction.  If an oil company worker has a medical emergency on a rig or vessel in the Gulf, he needs a helicopter to come as soon as possible – not after several weeks or months of contract negotiations and legal review.  Medical transportation is not a service that can be predicted or pre-scheduled.  When transportation is necessary, it is necessary right away.  On-demand medical transport is therefore *not* a service Bristow offers indiscriminately.

Bristow cites *Thibodeaux v. Executive Jets Int'l* and *Riegelsberger v. Air Evac. EMS* but neither of those cases involves the type of exclusive consortium arrangement discussed here. Indeed, the word "consortium" (or a synonym) is not found in either opinion.  *Riegelsberger*, like this case, involves medical transport which, by nature, is time-sensitive and subject to immediate and unexpected need.  But *Riegelsberger* makes no reference to any mandatory or exclusive consortium–only to "memberships, a form of prepaid preparation against some costs."[80] Bristow's detailed, multi-tiered consortium is far more than an optional prepaid discount plan.

---

[80]    *Riegelsberger*, 970 F.3d at 1065.

Notably, the *Riegelsberger* defendant did not limit its services to companies with prepaid plans, but also "markets its services to medical providers and emergency responders, who request rides on behalf of those who need them."[81]  Just as importantly, the evidence showed that "Air Evac does not discriminate within its segment. Nothing suggests, for example, that it arbitrarily makes some medically necessary trips but not others based on a patient's inability to pay or some other factor."[82]  Bristow unquestionably discriminates by refusing to consider "medically necessary" trips outside the exclusive consortium (which, it is hardly necessary to mention, takes into account the potential customer's ability to pay).  Thus, under the analysis set forth in *Riegelsberger*, Bristow cannot claim summary judgment.

Importantly, joining the Bristow consortium is not simply a matter of signing a basic form contract or agreeing to straightforward terms and conditions, as one might do when purchasing an airline ticket.  Instead, it involves entering into a binding Memorandum of Understanding drafted by Bristow amd the Tier 1 operators, and subject to amendment by them, without the control of lower tier members.  It also involves separately negotiating a contract containing "uniquely negotiated provisions that reflect commercial negotiations" including "confidential commercially sensitive information, vulnerable safety and security information, and private information."[83]  The relevant point is not simply that Bristow's potential customer's must "sign a contract" – which is true in a variety of contexts – but that the unique nature of the exclusive consortium model is very different from any arrangements in the cases Bristow cites.

This same point is true as to Bristow's marketing.  When Bristow says that it "holds itself out as willing to offer these transportation services and continually seeks to attract new

---

[81]    *Id.*

[82]    *Id.*

[83]    Dkt. #81, Exxon Letter to Court re Discovery.

Page 18

customers,"[84] that is not strictly true. Bristow does not market its transportation services, it markets (if anything) its exclusive consortium memberships. Bristow may claim that this is a distinction without a difference, but it is a *key* difference when, as here, the question is whether Bristow qualifies as a "common carrier." Moreover, the evidence of Bristow's marketing efforts is thin at best. For example, Bristow refers to the "business development" and "contact us" tabs on its website. Those tabs, when one clicks on Gulf of Mexico, simply show two 337 telephone numbers, with no name, no address, no explanation. That is hardly indicative of an attempt to market to the public. More importantly, it is undisputed that if someone who called those numbers, would not actually be permitted to request a SAR or medevac trip without a weeks-long negotiation process.

As Plaintiffs have previously noted, Bristow's business model is far more akin to the "private carrier" definition adopted by the Fifth Circuit in *Huntley v. Bayer MaterialScience, L.L.C.*, 452 F. App'x 453 (5th Cir. 2011): a carrier who "carries only for persons with whom he has an initial contract, and assumes no obligation to carry for others."[85] That definition describes Bristow's consortium business model quite closely, making Bristow far more akin to a private carrier than a common carrier. In *Huntley*, the Fifth Circuit held the defendant was not a "common carrier" when it provided rail services only to "a small number of unrelated entities who lease property within the Facility owned by Bayer; and performed such services for the Lessees pursuant to individual contracts and assumed no obligation to carry for others."[86] This case is directly analogous - Bristow provides air transportation only to a small number of

---

[84]   Dkt. #92-2 at p. 14.

[85]   *Huntley v. Bayer MaterialScience, L.L.C.*, 452 F. App'x 453, 456 (5th Cir. 2011).

[86]   *Id.* at 460.

unrelated entities pursuant to individual contracts (its "consortium"), and assumes no obligation to perform SAR / Medevac services outside of the consortium. Indeed, it flatly refuses to do so.

Bristow's sole response to *Huntley* is that it arose under the Federal Employee Liability Act ("FELA"), not the RLA. But FELA, by its express terms, applies to "every common carrier by railroad while engaging in commerce between any of the several States." 45 U.S.C. § 51. This is substantively identical to the RLA definition, and both Acts are in accord with traditional common law definitions of common carrier / private carrier.[87] Contrary to Bristow's claim, Plaintiffs are not asking the Court to import the entire FELA statutory and regulatory scheme into this case. Plaintiffs are simply recognizing that, under the common law and Title 45 of the U.S. Code (where both the RLA and FELA are enacted), there is a well-established and long-settled distinction between private carriers and common carriers. Applying that distinction here leads to the inevitable conclusion that Bristow's motion for summary judgment should be denied.

### F.    Bristow's "Whole Entity" Argument Fails

Bristow raises a "whole entity" defense, arguing that the Court should consider its global operations in analyzing the common carrier issue. This argument may be addressed briefly.

First, there is zero evidence in the record regarding Bristow's foreign operations, so there is nothing for the Court to consider. In any event, the explicit terms of the FLSA provide that it lacks extraterritorial application. 29 U.S.C. § 213(f). Nor does the RLA.[88] Bristow's foreign operations are therefore wholly irrelevant to this case.

Bristow also attempts to combine the oil and gas division along with the SAR/medevac division – ironically enough, in the same motion seeking to have Bristow Holdings US, Inc.

---

[87]    *See, e.g., Riegelsberger v. Air Evac EMS, Inc.*, 369 F. Supp. 3d 901, 906 (E.D. Mo. 2019) (noting that "federal courts look to the common law definition [of common carrier] for guidance.")

[88]    *Air Line Stewards & Stewardesses Asso. v. Nw. Airlines, Inc.*, 267 F.2d 170, 178 (8th Cir. 1959).

dismissed as a supposedly unrelated entity.  This allegation is also directly at odds with Bristow's firmly stated opposition to any kind of collective certification – if the exemption rises or falls as to the "whole entity," then collective-wide adjudication of both the SAR and oil and gas crews seems inevitable and appropriate.  But it is not quite so simple.  Although there may have been overlap between SAR and oil and gas many years, Glynn testified that during the relevant time period, there is a "true division" between SAR and oil and gas.[89]  As set forth above, the divisions operate different crews, different aircraft, with different equipment, and different mission profiles.  Notably, in *Thibodeaux v. Exec Jets,* the Fifth Circuit noted that the "whole entity" line of cases was "not entirely appliable" regarding "aircraft for the transporation of passengers,"[90] which is precisely the situation here.  Bristow's assertion is incorrect as a matter of law.  And while *Thibodeaux v. Exec Jets* did consider all three of that defendant's operations, it was based on the specific fact that, in order to obtain NetJet's services, a customer had to sign up for all three.  That is not the case here – some customers sign up only for Bristow's SAR/Medevac consortium, some utilize only oil and gas services, others may use both.

Finally, even if Bristow were correct that the two divisions should be considered together, it would still be a question for the jury whether the exclusive consortium model at play in the SAR/Medevac division takes the "whole entity" outside the common carrier exemption.  After all, the RLA does not say that a common carrier can provide *some* of its services indiscriminately, as to *some* of its aircraft and *some* of its crews.  If it is indeed an all-or-nothing issue, as Bristow seemingly desires, it may well be that a jury's finding against common carrier

---

[89]    Glynn Depo. at 19.
[90]    *Thibodeaux*, 328 F.3d at 752.

status will lead to the FLSA's application to the oil and gas division as well.  At the very least, this fact-intensive question cannot be resolved at summary judgment.

### G.    Defendants' Motion on the Joint Employer Issue is Premature

Defendants argue, briefly, that Bristow Holdings US, <u>Inc.</u> is not Plaintiffs' employer.  It cites only its own manager's declaration saying that Bristow Holdings is a "company with no employees."  This is a classic statement of legal conclusion – simply asserting the ultimate conclusion (this entity is not Plaintiffs' employer) without setting forth any underlying factual predicate.  Yet in his own deposition Glynn testified that he was employed by Bristow Group, Inc., which is ultimately the parent company of both Defendants.[91]

In any event, this analysis is more complicated than Mr. Glynn seems to think.  While Bristow US, LLC is unquestionably Plaintiffs' "employer" under the FLSA, the joint employer test allows for multiple entities to qualify as an employer for the same employee.  As the Fifth Circuit has noted, the FLSA definition of "employ" is the "broadest definition that has ever been included in one act."[92]  The joint employer analysis requires a four-part sliding scale test, which Bristow does not even attempt to address in its memorandum or in Glynn's declaration.[93]

More to the point, the parties specifically limited their discovery to date on the RLA issue, which Bristow has always said to be the one defense that should be addressed before all others.  In the initial motion requesting a motion briefing schedule, the parties specifically referenced "dispositive motions relating to the Railway Labor Act ('RLA') exemption,"[94] and Plaintiffs agreed not to file any non-discovery related motions "until the Court rules on the

---

[91]    *See* Glynn Depo. at 1 (describing his employer as "Bristow Group, Inc."); Dkt. #36 (Defendants' Rule 7.1 disclosure statement describing Bristow Group as the ultimate owner of both Defendants).

[92]    *Shultz v. Hinojosa*, 432 F.2d 259, 264 (5th Cir. 1970).

[93]    *See Gray v. Powers*, 673 F.3d 352, 354-357 (5th Cir. 2012).

[94]    Dkt. #51 at p. 2.

dispositive motions on the RLA."[95]  The Court's Order setting a briefing schedule used this same language and specifically referenced the RLA exemption.[96]

It has been Defendant's position since the very outset of this case that this RLA motion should take priority.  To that end, the parties conducted discovery focused on the RLA issues. Defendant did <u>not</u> reference filing a motion for summary judgment on the joint employer issue, which is therefore premature.  Defendants have expressly communicated, to the Plaintiffs and to the Court, that this was to be an RLA motion, and they should be estopped from raising other issues now.  Defendants' current position is plainly inconsistent with their prior position, which was presented to and accepted by the Court, and allowing Defendants to raise these issues at this juncture would prejudice Plaintiffs – these are classic hallmarks of judicial estoppel.[97]  Plaintiff therefore requests that this motion be denied with respect to Bristow Holdings US, Inc.

## H.    Defendants' Motion on the Willfulness is also Premature

Defendants also ask the Court to find their actions were not "willful" under 29 U.S.C. § 260, limiting Plaintiffs to a 2-year statute of limitations; and in "good faith," permitting the Court to reduce or disallow liquidated damages.  The key distinction is burden of proof – Plaintiffs bear the burden on willfulness, and Defendants bear the burden on good faith.[98]  "[T]he burden to show a good-faith basis for wage practices is 'substantial.'"[99]  Neither issue is ripe for resolution. As discussed above, the sole issue contemplated for this motion was the RLA exemption.

---

[95]  *Id.*

[96]  Dkt. #52.

[97]  *See New Hampshire v. Maine*, 532 US 742, 750-51 (2001).

[98]  *See, e.g., Dacar v. Saybolt, L.P.*, 914 F.3d 917, 920 (5th Cir. 2018).

[99]  *Id.* at 931.

Bristow should be estopped from expanding this motion to include other issues not contemplated by the Parties or the Court, and not adequately addressed in discovery.

The motion should also be denied on substantive grounds. Questions such as willfulness or good faith are highly fact intensive and should only be determined at trial, after a full presentation of evidence and finding of liability. "Willfulness is a fact issue for the jury."[100] The limited evidence currently before the Court does not reflect that Bristow acted in careful good faith as it claims. Throughout this litigation (including this motion) Bristow has relied heavily on the declarations and testimony of area manager Jason Glynn. Yet when deposed about his prior knowledge of the RLA, Glynn stated that he had never heard of it before this lawsuit:

> Q.    When is the first time you've heard of the Railroad [sic] Labor Act? [instruction regarding privilege]
> A.    Yes. So to answer the question, no, not since this has all materialized    with this case.
> Q.    Okay. So it was after the lawsuit was filed?
> A.    Correct.[101]

Bristow cannot plausibly claim to have acted in good faith if its own star witness had no inkling of the RLA's *existence* before suit was filed. "good-faith inquiry requires a comprehensive, documented review related to the specific violation at issue, not just the FLSA generally."[102] The record is wholly bereft of *any* review, much less a "comprehensive, documented review," regarding the application of the RLA exemption to the SAR plaintiffs at issue here. Instead, Bristow's primary argument in favor of its own good faith is that it relied on the findings of the NMB, and that it "subjectively believed" that it was exempt .[103] As discussed

---

[100] *Karr v. City of Beaumont*, 950 F.Supp. 1317, 1325 (E.D. Tex. 1997).

[101] Glynn Depo. at 112-113.

[102] *Gentry v. Hamilton-Ryker IT Sols., LLC*, 2024 U.S. Dist. LEXIS 239989, at *8 (S.D. Tex. Dec. 10, 2024).

[103] Dkt. #92-2, Defendants' Memorandum at p. 21.

above, the NMB did not issue any *findings*, it simply adopted a stipulation of the parties.  Nor is there evidence to suggest that Bristow made any attempt to reconsider this issue after January 2023, when it stopped accepting SAR ad hoc flights and transitioned to its current exclusive consortium model.  Such a dramatic change in business model should have alerted Bristow to the possibility that it may have to adjust its pay and overtime practices.  Bristow's self-professed "subjective" belief is simply not enough – "'good faith' in this context requires more than ignorance of the prevailing law... It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them."[104]  Subjective belief in one's own righteousness, without any "active steps" to examine that belief, is not good faith.

Even if the Court were to find Bristow in good faith, summary judgment should still be denied because "even if a trial court is satisfied that an employer acted both in good faith and reasonably, it may still award liquidated damages at its discretion ..."[105]  A determination of liquidated damages should await the conclusion of trial.

## CONCLUSION

Wherefore, for the above-stated reasons, Plaintiffs respectfully request that Defendants' second Motion for Summary Judgment should be denied in all respects.

Respectfully Submitted:

**/s/ Charles J. Stiegler**
Charles J. Stiegler, #33456
STIEGLER LAW FIRM LLC
318 Harrison Ave., Suite #104
New Orleans, La. 70124
(504) 267-0777 (telephone)
(504) 513-3084 (fax)
Charles@StieglerLawFirm.com

KENNETH C. BORDES,
ATTORNEY at LAW, LLC
4224 CANAL ST.
NEW ORLEANS, LA 70119
P: 504-588-2700
F: 504-708-1717
E: KCB@KENNETHBORDES.COM

---

[104] *Carmack v. Park Cities Healthcare, LLC*, 321 F. Supp. 3d 689, 709 (N.D. Tex. 2018).

[105] *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 n.8 (5th Cir. 1990).