UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BENJAMIN MOSLEY, ET AL.                    CIVIL ACTION

VERSUS                                     NO: 23-2674

BRISTOW U.S., LLC and BRISTOW              SECTION: "A" (4)
HOLDINGS U.S., INC.

## ORDER AND REASONS

The following motion is before the Court: **Motion for Summary Judgment (Rec. Doc. 92)** filed by the defendants, Bristow U.S., LLC and Bristow Holdings U.S., Inc. (hereinafter collectively "Bristow" or "Defendants"). The named plaintiffs, Benjamin Mosley, Steven Tucker, and Grayson Young, along with all opt-in plaintiffs (collectively "Plaintiffs"), oppose the motion. The motion, submitted for consideration on April 16, 2025, is before the Court on the briefs without oral argument.[1] For the reasons that follow, the motion is granted.

### I.    Background

Plaintiffs brought this action on behalf of themselves and all other similarly situated employees of Bristow (current and former) alleging that they were denied overtime compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*

Bristow provides helicopter-based transportation to both private and

---

[1] Bristow has requested oral argument but the Court is not persuaded that oral argument would be helpful in light of the issues presented.

governmental entities who seek services for, but not limited to, the oil and gas energy sector, search and rescue operations, and medical evacuations. (Rec. Doc. 20-4, Glynn declaration ¶ 3). According to the Complaint, Mosley, Tucker, and Young were "tech crew" employees for Bristow, and Glenn Jimenez was a helicopter pilot for Bristow, performing operations on the Louisiana coast from Bristow's Louisiana business location in Galliano, Louisiana.[2] (Rec. Doc. 1, Complaint ¶ 12). Plaintiffs allege that they, along with other similarly situated individuals, were employed primarily to perform manual labor for Bristow. These duties included hoist operations, rescue swimming, piloting helicopters, "AMT's" (helicopter technicians), rescue missions, and training missions. (*Id.* ¶ 14).

Plaintiffs allege that they, along with other similarly situated individuals in the tech crew, AMTs, and pilots, were required to work at least twelve hours per day for fourteen straight days—totaling a minimum of 84 hours per week. (*Id.* ¶ 15). However, Plaintiffs and those similarly situated would be directed to only clock in for 11.43 hours per day, even though they worked twelve hours per day, and oftentimes longer depending on Defendants' needs. Plaintiffs' requests for an explanation as to why they would need to log in less hours than they actually were required to work were never responded to. (*Id.* ¶ 16). Further, after working a minimum of 168 hours over a two week period, 84 hours per week, Plaintiffs and those similarly situated would receive a bi-weekly paycheck

---

[2] For simplicity, the Court refers to the employment status of all plaintiffs in the past tense notwithstanding that some of the plaintiffs continue to be employed by Bristow. The former/current distinction is not material to any issue currently before the Court.

reflecting only 80 hours, 88 hours less than they actually worked, and including no overtime for the 44 plus hours of overtime worked in those weeks. (Complaint ¶ 17).

Plaintiffs allege that they and those similarly situated under the same unlawful pay policies were non-exempt employees under the FLSA and were never paid an overtime rate of one and one-half times their regular rate of pay for hours worked in excess of 40 hours per week. (*Id.* ¶ 18). Plaintiffs allege that Bristow's violations of the FLSA were willful and not in good faith. (*Id.* ¶ 20).

Based on the foregoing allegations, Plaintiffs filed suit seeking to proceed as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of all other current and former similarly situated employees, including tech crew, pilots, and AMTs, who worked for Bristow on a typical schedule of 12 hours or more per day for 14 days, within three years prior to the date of filing this lawsuit, and who were not paid overtime wages for hours worked over forty in a workweek.[3] (*Id.* ¶ 23). Plaintiffs seek a litany of damages and a trial by jury. (*Id.* ¶¶ 34 & 35).

Not unlike many other FLSA cases, this case required intervention by the Court rather quickly following the filing of the Complaint and service on the defendants. Concerned with statute of limitations issues typical of putative FLSA collective actions, Plaintiffs filed an Objection to Extension of Time To Plead (Rec. Doc. 8), which is a not-often-used procedural mechanism to foreclose the customary 21-day pleading extension available to a defendant under Local Rule 7.8 of this district. Bristow then filed

---

[3] As it turns out no plaintiff in this case is an AMT.

a contested motion for an extension of time to answer (requesting two weeks) with a request for expedited hearing. (Rec. Docs. 10 & 11). Bristow explained that it required the extension to prepare a dispositive motion, which would seek a full dismissal of the complaint based on Title II of the Railway Labor Act, which Bristow contended would exclude the plaintiffs from the overtime protections of the FLSA.

On the same day that Bristow filed its contested motion for an extension of time to answer, Plaintiffs filed their Motion for Equitable Tolling, or in the Alternative, Expedited Discovery (Rec. Doc. 12), in order to protect the rights of the putative class members. Bristow moved to continue the submission date for that motion so that it would not be forced to file its opposition before it filed its dispositive motion. (Rec. Doc. 13). The Court granted Bristow's requested extensions. (Rec. Doc. 16, Order).

Bristow then filed its dispositive motion which was grounded on the contention that the plaintiffs are exempt from the overtime requirements of the FLSA due to the applicability of Title II of the Railway Labor Act ("RLA"). (Rec. Doc. 20, Motion). The FLSA provides for an exemption with respect to any employee of "a carrier by air" subject to the provisions of the RLA. 29 U.S.C. § 213(b)(3). The RLA extends to and covers "every **common carrier** by air **engaged in interstate or foreign commerce** . . . and every air pilot or other person who performs any work as an employee or subordinate official of such carrier . . . ." 45 U.S.C. § 181 (emphasis added). While it was clear that Bristow was a carrier by air—a point that the plaintiffs did not dispute— the dispute was whether Bristow was a *common* carrier, a term that the RLA does not define.

The Court explained that an FLSA exemption constitutes an affirmative defense by the employer so the burden of proving whether the RLA exemption applies, which includes proof of common carrier status and interstate commerce, falls solely upon Bristow. (Rec. Doc. 30, Order and Reasons at 5). Bristow simply could not prevail on its affirmative defense based on the pleadings alone. (*Id.* at 5-6). The Court explained that the facts necessary for Bristow to meet its burden of proof as to its affirmative defense are not present on the face of the Complaint and no good faith argument to the contrary could be made. (*Id.* at 7).

Limited discovery has now proceeded and Bristow once again, this time in the posture of a Rule 56 motion for summary judgment, argues that it is entitled to judgment as a matter of law because the RLA exempts Bristow from the FLSA's overtime mandates based on its status as a common carrier by air. Should the Court not agree, Bristow further argues that Plaintiffs cannot establish a willful FLSA violation; and Bristow argues that it has acted in good faith. Finally, Bristow argues that Bristow Holdings U.S., Inc. should be dismissed from this case because it was never the employer of any of the plaintiffs.

The parties' positions are addressed below.

## II.    Discussion

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (*citing Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (*citing Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (*citing* Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (*citing SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

When faced with a well-supported motion for summary judgment, Rule 56 places the burden on the non-movant to designate the specific facts in the record that create genuine issues precluding summary judgment. *Jones .v Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). The district court has no duty to survey the entire record in search of evidence to support a non-movant's position. *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1992); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988)).

**APPLICABILITY OF THE RLA EXEMPTION**

Bristow's position is that it is a common carrier by air engaged in interstate commerce so it is exempt from the FLSA's overtime mandates by operation of the RLA,

and therefore entitled to summary judgment. Plaintiffs no longer contest that Bristow engages in interstate commerce.[4] Plaintiffs do not dispute that their job duties are directly related to air transportation. Bristow is undisputedly a carrier by air. Thus, the only issue regarding applicability of the RLA exemption is whether Bristow is a *common* carrier by air.

Bristow contends that while the parties dispute the RLA's applicability, none of the facts pertinent to the determination are in dispute. Bristow is correct on this point. There are no material disputed facts for the jury to resolve in conjunction with the applicability of the RLA exemption. Bristow's motion is based on undisputed facts (although perhaps disputed characterizations of those facts), and therefore presents to the Court a legal determination which is ripe for adjudication on summary judgment.[5]

The parties agree that the appropriate legal standard, given that Congress has not defined "common carrier" for purposes of the RLA exemption, derives from *Woolsey v. National Transportation Safety Board*, 993 F.2d 516 (5th Cir. 1993). That decision explains that the crucial determination in assessing the status of a carrier is whether the carrier has held itself out to the public *or to a definable segment of the public* as being willing to transport for hire, *indiscriminately. Id.* at 523 (citing cases). The *Woolsey* test

---

[4] Bristow's SAR/Medevac flights include stops in Louisiana and Texas.

[5] Plaintiffs contend that summary judgment should be denied because a fact-intensive question like common carrier status should be resolved by the jury. To be sure, common carrier status is a fact-driven determination but it remains that none of facts material to the determination in this case are in dispute. The question of whether the undisputed facts, when considered against the backdrop of binding precedent, establish Bristow's status as a common carrier is a legal question for the Court and not for the jury.

"is an objective one, relying upon what the carrier actually does rather than upon the label which the carrier attaches to its activity or the purpose which motivates it." *Id.* (quoting *Las Vegas Hacienda, Inc. v. Civil Aeron. Bd.*, 298 F.2d 430 (9th Cir. 1962)).

An FLSA exemption constitutes an affirmative defense by the employer so the burden of proving whether the RLA exemption applies, which includes proof of common carrier status and interstate commerce, falls solely upon Bristow. *See Patterson v. O'Bar Wrecker Serv., LLC*, No. 22-51, 2023 WL 5004417, at *5 (N.D. Tex. July 31, 2023) (citing *Donovan v. Hamm's Drive Inn*, 661 F.2d 316, 317 (5th Cir. 2013)); *Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 723 (W.D. Tex. 2010). As Plaintiffs note, to prevail on its affirmative defense Bristow must prove "beyond peradventure" that the undisputed facts confirm that it is a common carrier by air. *See Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

The question then is whether Bristow has satisfied its burden under the foregoing standard of proving that it has held itself out to a definable segment of the public as being willing to transport for hire, indiscriminately.

Bristow operates two business divisions within the Gulf of Mexico—the oil and gas division, which provides passenger transportation to and from oil and gas facilities, and the search and rescue and medical evacuation division (SAR/Medevac), which provides search and rescue and medical evacuations from oil and gas facilities. In the oil and gas division, some customers have signed longer-term contracts with Bristow but others have not and simply pay for the "one-off" ad hoc flights that Bristow offers in that division.

The plaintiffs in this action all work in the SAR/Medevac division. As of January 2023, in order to use Bristow's SAR/Medevac flights, customers must join Bristow's SAR/Medevac consortium in order to receive "transport for hire" from Bristow. The SAR/Medevac division no longer allows requests for ad hoc flights in the same manner that the oil and gas division allows. It is Plaintiffs' contention that the consortium business model that Bristow employs for the SAR/Medevac division is inconsistent with transporting for hire *indiscriminately*, and therefore the RLA exemption does not apply.[6]

To obtain air transport services from the SAR/Medevac division, customers choose between three tiers of the consortium depending on their preferences, with Tier 1 providing the most robust service offerings, followed by Tier 2 and Tier 3. Bristow offers its SAR/Medevac services pursuant to a Memorandum of Understanding (MOU) that applies to customers of all three tiers (but only Tier 1 customers can participate in drafting or editing the MOU). But merely agreeing to the MOU is not sufficient to join the consortium because potential members must also enter into an individual contract with Bristow before they can receive any air transport services from the SAR/Medevac division. It may take anywhere from thirty days to six months to negotiate and finalize an

---

[6] Plaintiffs do not dispute that Bristow's oil and gas division, which does not use the consortium business model used in the SAR/Medevac division, operates in such a manner as to satisfy the requirements for common carrier by air status. Plaintiffs have attempted to emphasize that there is a "true division" between the oil and gas and SAR/Medevac divisions at Bristow in order to counter Bristow's argument that the entity's operations as a whole should be considered when determining common carrier status. In *Thibodeaux v. Executive Jet International, Inc.*, the Fifth Circuit applied the whole entity approach to separate, corporate entities that worked together as part of an air transportation program to determine common carrier status. 328 F.3d 742, 752 (5th Cir. 2003). With Bristow, however, it is less clear that the oil and gas and SAR/Medevac divisions work together to provide air services as part of a single program offering.

individual contract; the contracts vary greatly in length and complexity. The specifics of the individual contracts are kept in the strictest confidence.

Bristow maintains that the SAR/Medevac consortium is open to any potential customers wishing to utilize Bristow's SAR/Medevac services and there is no limit on consortium membership overall or per tier. As of today the SAR/Medevac consortium has 15 member companies and Bristow is actively marketing its services in an effort to increase that number.

Bristow argues that the Fifth Circuit's decision in *Thibodeaux v. v. Executive Jet International, Inc.*, 328 F.3d 742 (5th Cir. 2003), is not only instructive on the application of the *Woolsey* test to its operations but also provides binding holdings that support its status as a common carrier by air.

In *Woolsey v. National Transportation Safety Board*, the pilot-plaintiff sought to challenge an administrative determination that his small air carrier company had operated as a common carrier. His company, PTI, had carved out a niche business that specialized in transporting musicians with whom he had contracted for air transport services.[7] The plaintiff in *Woolsey* had his pilot's license revoked based on the determination that the flights were operated as a common carrier, which requires more stringent safety requirements than those applicable to private carriers.

The specific flights at issue were conducted pursuant to a long-term contract with

---

[7] The *Woolsey* case did not involve an FLSA claim or applicability of the RLA but the entire case turned on whether the air carrier was a common carrier under the same federal regulations at issue in this case.

country music star Reba McEntire, who had exclusive use of a specific aircraft that was customized for her and her guests. Ms. McEntire was even allowed to leave her (and her guests') personal belongings on the plane at all times. The plaintiff was convinced that his flight operations for Ms. McEntire were more appropriately characterized as private in nature and not flights in common carriage.[8]

The plaintiff's position in *Woolsey* was that PTI did not furnish transportation indiscriminately because it furnished flights only to those with whom it saw fit to contract, like Ms. McEntire. PTI argued that it did not advertise to the general public. And according to PTI, its "holding out" to the public was no more than an invitation to contract on a case-by-case basis with no uniformity of charges or willingness to carry all persons. *Id.* at 522.

The Fifth Circuit nonetheless concluded that the air carrier had acted as a common carrier with respect to the McEntire flights in question. *Woolsey*, 993 F.2d at 525. The Fifth Circuit rejected the proposition that an air carrier engages in common carriage only when it transports all members of the public at the same price whenever there is room on the airplane. *Id.* at 523. The Fifth Circuit had found no authority for applying such a restrictive test to air carriers. *Id.*

Important to the result in *Woolsey* was the fact that PTI had advertised its services and actively solicited business. *Id.* at 521. There was evidence that PTI had

---

[8] Part 135 of the Federal Aviation Regulations applies to common carriers. Part 91 applies to private carriers. The safety standards applicable under Part 91 are less stringent than those applicable under Part 135.

marketed itself to numerous rock stars and sought to enter and capture the country music industry by directly soliciting the business of country music luminaries like McEntire. *Id.* at 525. It did not matter that PTI did not solicit business from the general public but rather only from a very niche market consisting of certain types of musicians. It was sufficient that PTI had solicited business from a small "segment" of the flying public. *Woolsey*, 993 F.2d at 525 n.24. There was substantial evidence that PTI had held itself out as being willing to serve all members of the music industry who were willing to pay for its services. *Id.* at 524. Although the plaintiff argued that he was discriminating about whom he would serve, there was no evidence that PTI had ever turned away any member of the music industry who was able to pay PTI's fees. *Id.* The Fifth Circuit was convinced that on those facts alone the federal agency was justified in concluding that that PTI had acted as a common carrier by air. *Id.* at 524.

In reaching its conclusion the Fifth Circuit rejected the proposition that the absence of tariff or rate schedules, and providing transportation only pursuant to separately negotiated contracts or occasional refusals to transport, were conclusive proof that the carrier was not a common carrier. *Woolsey*, 993 F.2d at 524 . This was the case even though most common carriers do utilize uniform tariffs applicable to all who apply for service. *Id.* The existence of a contract negotiated for a special price does not alone suffice to make the carrier a private carrier. *Id.* (citing Las Vegas Hacienda, 298 F.2d at 434). Under *Woolsey* what was crucial is that the common carrier defined itself through its own marketing efforts as being willing to carry any member of that segment of the public which it serves. *Id.* at 524.

The decision in *Thibodeaux v. Executive Jet International* is even more instructive because it applies the *Woolsey* test in the context of a flight crew member who claimed that he should have been paid overtime because the RLA exemption did not apply to his employer, whom the plaintiff contended was not a common carrier.

The plaintiff in *Thibodeaux* was a flight attendant who worked specifically for one corporate entity, EJI, in a program called NetJets, that consisted of several corporate entities that while operating separately, each contributed a necessary service to the NetJets program as a whole. EJI in particular operated most of its flights under Part 91 (non-commercial, private) and not Part 135 (applicable to common carriers). *Thibodeaux*, 328 F.2d at 745. NetJets' services were only available to participants in the program who had contracts for services. Participants in NetJets were required to enter into three separate contracts, the first two of which had five-year terms. *Id.* at 746.

Even with all of the foregoing the Fifth Circuit concluded that because EJI (even if through its affiliates) had held itself out to a definable segment of the public as being willing to transport for hire indiscriminately it was a common carrier and therefore subject to the RLA exemption to the FLSA's overtime requirements. *Id.* at 753. Using the whole entity approach it did not matter that the specific entity that employed *Thibodeaux* was not the one engaging in marketing activity (holding out) or the entity that was a party to all of the required contracts. What was important was that the NetJets program was marketed to draw in business. *Thibodeaux*, 328 F.3d at 746. The plaintiff had argued that the lack of regular flight schedules and fixed fares was indicative of a carrier that did not offer air transportation indiscriminately. But the Fifth

Circuit was guided by the *Woolsey* decision, which had rejected the lack of fixed fares or regular flight schedules as depriving a carrier of common status. *Thibodeaux*, 328 F.3d at 753.

The Court is persuaded that the reasoning employed in both *Woolsey* and *Thibodeaux* make clear that under the undisputed facts of this case Bristow meets the requirements for common carrier by air status. Bristow has established that it solicits business from a definable segment of the general public. Bristow's definable segment of the marketplace is no narrower than the market segment in *Thibodeaux* (in fact, it is likely broader). Plaintiffs contention that Bristow does not market aggressively enough finds no support in the jurisprudence. There is no evidence that Bristow ever turned anyone away in its definable segment who sought to join its consortium, and was willing to pay for its services. In both *Woolsey* and *Thibodeaux* the carriers only provided services to those customers with whom they had contracts, and in *Thibodeaux* potential customers were required to enter into three separate long-term contracts in order to obtain services.

Hoping to avoid summary judgment in light of *Woolsey* and *Thibodeaux*, Plaintiffs contend that neither case involved the type of exclusive consortium arrangement that Bristow uses in the SAR/Medevac division. Plaintiffs point out that Bristow does not operate a 911-style service where anyone in the Gulf with a medical emergency (and the ability to pay) may call a number and request a pickup. Bristow refuses to consider these "ad hoc" flights for SAR/Medevac services even though medical transportation is not a service that can be predicted or prescheduled because it is needed right away and

on-demand. Plaintiffs emphasize that Bristow is not simply an air ambulance company like those that have been determined to be common carriers. Plaintiffs argue that because Bristow is not willing to transport a medical patient within the Gulf of Mexico for any person or entity who is not already a member of its exclusive consortium, this is not indiscriminate behavior, and is therefore inconsistent with how a common carrier works.

Plaintiffs argue that rather than transporting for hire indiscriminately, what Bristow is willing to do is to indiscriminately enter into negotiations with any potential customer regarding possibly joining the consortium if they can ultimately agree to contractual terms. Plaintiffs point out that what Bristow markets is its consortium memberships and not its transportation services, which is hardly indicative of an attempt to market air transport for hire to the public. Plaintiffs argue that with Bristow it is not a matter of signing a basic form contract or agreeing to straightforward terms and conditions like when purchasing an airline ticket. It is not so much that customers must sign a contract but that the unique nature of the exclusive consortium model is very different from any arrangements in the cases Bristow cites.

The Court is not persuaded that Bristow's consortium business model, which is essentially a contract for services model, deprives it from common carrier status. Neither *Woolsey* nor *Thibodeaux* suggests that the contracts involved must be form contracts that do not require lead time to negotiate. Both *Woolsey* and *Thibodeaux* reject the proposition that limiting air services to contractual partners is inconsistent with common carrier status. *Woolsey* and *Thibodeaux* make clear that Bristow need not operate its business like a 911 service in order to provide air transportation for hire indiscriminately.

Rather than follow the binding authority in *Woolsey* and *Thibodeaux* that deal specifically with air carriers, Plaintiffs urge the Court to deny summary judgment based on the unpublished decision in *Huntley v. Bayer Material Science, LLC*, 452 Fed. Appx. 453 (5th Cir. 2011) (unpublished), which involved a railroad facility (not an air carrier) and which did not involve the RLA. *Woolsey* and *Thibodeaux* cannot be ignored in favor of an unpublished decision that did not apply the test for air carriers that controls in this circuit. In *Woolsey*, the Fifth Circuit declined to be persuaded by common carriage cases developed outside the context of aviation law. 993 F.2d at 523.

In sum, Bristow has satisfied its burden of establishing that it is a common carrier by air engaged in interstate commerce. Bristow is therefore exempt from the FLSA's overtime provisions and Plaintiffs' claims for unpaid overtime are barred as a matter of law. Bristow is entitled to judgment as a matter of law on its affirmative defense.

Bristow's remaining arguments offered in support of its motion are moot.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 92)** filed by the defendants, Bristow U.S., LLC and Bristow Holdings U.S., Inc., is **GRANTED**. The complaint is dismissed with prejudice.

April 21, 2025

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE